The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES DOMINQUE MAYFIELD,<br><br>Defendant. | NO. 92-CR-1781-RJB<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)** |

## I.   INTRODUCTION

The United States of America, by Tessa M. Gorman, Acting United States Attorney for the Western District of Washington and Helen J. Brunner, Assistant United States Attorney for said District, files this memorandum in response to Defendant James Dominque Mayfield's motion pursuant to 18 U.S.C. § 3582(c)(1)(A) for reduction in the life sentence this Court imposed following his conviction of premeditated murder. To support his motion, Mayfield points to his chronic kidney disease and the coronavirus disease 2019 pandemic as extraordinary and compelling reasons why his sentence should be reduced, but the record shows that he has already recovered from COVID-19 with limited symptoms. He also points to the amount of time that he has already served, and his rehabilitative efforts while in custody offering some letters to support that claim. But the record also shows that despite Mayfield's sworn statements at the time of his guilty plea,

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB  - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

he continues to minimize his role in these particularly brutal, senseless, and disturbing murders suggesting that he is not accepting responsibility for his crimes. For these reasons, and those set forth in detain below, the record simply does not warrant a reduction in his sentence.

## II.  FACTUAL BACKGROUND

### A.  Mayfield's Conviction and Sentence.

James Dominique Mayfield is serving the life sentence that this Court imposed following his guilty plea to a charge of premeditated murder in violation of 18 U.S.C. 1111(a). The charge was the result of the events of December 4, 1992, when Mayfield and his codefendant Damien Loren Jackson entered a residence on what was then the Fort Lewis Military Reservation, and murdered Allen Lamarr King, Sr. and his three sons. PSR ¶ 4. The three children were ages 7, 4 and 18 months at the time of their deaths. PSR ¶ 4. King was believed to have provided the information about the drug distribution activities engaged in by Jackson and Gregory Clifford Paige that law enforcement officers used to obtain the search warrants leading to their arrest. PSR ¶¶ 9-10. The murders were apparently committed in retaliation for King's believed role. PSR ¶¶ 9-10. Although Mayfield was not a target of, or charged in, the drug investigation, the presentence report notes that Mayfield visited Paige and Jackson while they were in the Pierce County jail before their release on bond, and stored their cocaine in his apartment for a time. PSR ¶ 10.

As documented in the presentence report, on the afternoon of December 4, 1992, Mayfield switched cars with a friend named Edgar Outland because Outland's car had a bumper sticker that allowed access to the military base. PSR ¶ 13. Paige and Jackson were with Mayfield at the time. PSR ¶ 13. Sometime thereafter, the three then drove to the base, where Mayfield and Jackson then entered King's residence with a machete while Paige drove around until he was paged to return to the scene. PSR ¶ 23.

Sometime that evening, Paige called Outland and asked Outland to rent a motel room with direct access from a car. PSR ¶ 14. Paige insisted on this requirement claiming he did not want to walk through the lobby. PSR ¶ 14. Outland rented a room at a motel in

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Fife, and waited for Paige at that location. PSR ¶ 15. Paige arrived driving Outland's car
2  with Mayfield and Jackson who were both naked except for their underwear. PSR ¶ 15.
3  Mayfield and Jackson then took showers in the rented motel room while Paige and Outland
4  traveled to Paige's apartment where Paige changed clothes and then packed a bag with
5  clean clothes for Mayfield and Jackson. PSR ¶¶ 17-18.

6        Several days later, Mayfield later told Outland that after he and Jackson entered the
7  King residence, Jackson grabbed one of the children and ordered King to the ground. PSR
8  ¶ 28. At that point, Mayfield attached King with the machete. PSR ¶ 28. Mayfield told
9  Outland that Jackson slit the throats of two of the children but did not disclose who killed
10 the third child. PSR ¶ 28. Mayfield also stated that the pair had picked up the 18-month-
11 old toddler by the ankles and beat his head against the wall. PSR ¶ 25.

12       The medical examiner's report confirms that the murders were committed using two
13 different weapons, a machete and a knife, and that two assailants must have been involved.
14 PSR ¶ 24. The examination revealed that King suffered some 65 chopping type wounds
15 one of which penetrated the back of his skull and entered the brain. PSR ¶ 24. King also
16 had chopping wounds on his back that were severe enough to break ribs, and various knife
17 wounds. PSR ¶ 24. The nature of the wounds and the footprints at the scene established
18 that King's murder was the work for two assailants. PSR ¶ 24.

19       Examination revealed that the 18-month-old child had suffered a fractured skull, as
20 well as a chopping type wound to the throat that cut through the fourth cervical vertebrae,
21 and a stab wound that cut the left jugular vein. PSR ¶ 25. The four-year-old was found to
22 have three chopping-type wounds to the side of the neck and shoulder consistent with the
23 use of a machete. PSR ¶ 26. The wound to the neck cut the carotid artery and jugular vein.
24 PSR ¶ 26.

25       Finally, the oldest child sustained several cutting wounds with a knife including
26 wounds that cut a jugular vein and severed his trachea. PSR ¶ 27. It also appears that he
27 had been dragged into a bedroom closet. PSR ¶ 27. Mayfield's fingerprint in the child's
28 blood was found on the closet door. PSR ¶ 27.

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    The weapons used in the murders were never recovered and reportedly had been
2 thrown in the Puyallup River. PSR 21. Although Mayfield did not cooperate in the
3 investigation, he did lead officers to a burn pile south of Fort Lewis where the clothing that
4 Mayfield and Jackson wore during the murders was burned. PSR ¶ 21. Officers found two
5 unburned shoes that still had evidence of blood and that matched the bloody footprints
6 found at the murder scene. PSR ¶ 21. A government witness was prepared to testify that
7 Mayfield owned a pair of Reebock shoes like one of the shoes that the officers located near
8 the burn pile. PSR ¶ 21. Mayfield also admitted that fact. PSR ¶ 21.

9    Mayfield enter a guilty plea to one count of murder with premeditation as charged
10 in count 2 of a superseding information. Dkt. 5, 51. He was the first of the three defendants
11 to enter a guilty plea. In addition to the written factual statement provided by the
12 government, the defendants jointly filed a factual statement. *See* Dkt. 54. The presentence
13 report summarized these facts and Mayfield admitted the truth of these statements during
14 his change of plea hearing.

15    Despite that fact, some two months after his guilty plea and prior to his sentencing,
16 Mayfield sought to withdraw his plea. Dkt. 73. After briefing and a hearing, this Court
17 denied the motion, and sentences Mayfield to life imprisonment consistent with one of the
18 two statutory penalties available for the crime of murder with premeditation in violation of
19 18 U.S.C. § 1111(a), the other being death.

20    Mayfield then appealed this Court's order and the judgment but later dismissed that
21 appeal voluntarily. Instead, he then filed a motion pursuant to 28 U.S.C. 2255 arguing that
22 his guilty plea should be vacated because he received ineffective assistance of counsel.
23 Specifically, Mayfield claimed that counsel misinformed him about the potential for the
24 death penalty if he was found guilty at trial. *See United States v. Mayfield*, 1995 WL
25 139260 (9th Cir. 1995). In the opinion affirming this Court's denial of the motion, the
26 Ninth Circuit noted that the charge to which Mayfield had pleaded guilty carried the
27 possibility of the death penalty, and that if counsel had failed to advise Mayfield of that
28 fact, this would have been ineffective representation. *Id.* citing *Risher v. United Sattes,*

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB  - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   992 F.3d 982, 983 (9th Cir. 1993).  The Court also noted that the government had
2   overwhelming physical and testimonial evidence that Mayfield had participated in the
3   murders and that it was sound strategy to seek a guilty plea rather than risk a potential death
4   sentence.  *Id.*  As such, the Ninth Circuit affirmed this Court's denial of his motion.

5   Mayfield is now serving his sentence at FCI Beaumont Medium.  He is now 51 years
6   old.

7   **B.   Mayfield's Medical Conditions.**

8   Mayfield's BOP medical records confirm that in August 2019, he was diagnosed
9   with mild kidney disease with a glomerular filtration rate (GFR) that is only slightly below
10  normal.  *See* Def. Ex. C at 11-15, 64-68.  For this condition, he appears to be monitored
11  by the facility's chronic care clinic.  Mayfield tested positive for COVID-19 on August 29,
12  2020. Def. Ex. C at 47.  The medical records noted that he had mild symptoms.  Def. Ex.
13  C at 2-9, 18.  The medical records do not reflect any other medical conditions of note and
14  he does not suggest to the contrary in his motion.

15                              **III.   ARGUMENT**

16  **A.   The Legal Standards for Compassionate Release**

17  "'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes
18  a final judgment' and may not be modified by a district court except in limited
19  circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010).  Consistent with that
20  principle, 18 U.S.C. § 3582(c) provides that a court "may not modify a term of
21  imprisonment once it has been imposed," except under three specified circumstances, one
22  of which is a motion under subsection 3582(c)(1)(A).  Section 3582(c)(1)(A) provides a
23  court with jurisdiction to reduce an otherwise final sentence where a defendant establishes:
24  (1) the exhaustion requirements in the statute have been satisfied; (2) an extraordinary and
25  compelling reason supports the motion; and (3) any reduction is consistent with the
26  applicable policy statement.  18 U.S.C. § 3582(c)(1)(A).

27  Congress directed the Sentencing Commission to draft the referenced policy
28  statement in 28 U.S.C. § 994(t).  That policy statement, found at USSG § 1B1.13, directs

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that before reducing a final sentence, in addition to an "extraordinary and compelling reason" supporting the reduction, a court must find (1) that the defendant does not present a danger to others and the community, and (2) that the reduction be appropriate after considering the factors in 18 U.S.C. § 3553(a). As relevant to the defendant's motion, the application notes then provide that "extraordinary and compelling" reasons exist under the following circumstances:

> (A)   Medical Condition of the Defendant.—
>
> > (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii)   The defendant is—
> >
> > > (I)   suffering from a serious physical or medical condition,
> > >
> > > (II)   suffering from a serious functional or cognitive impairment, or
> > >
> > > (III)   experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13 cmt. n.1. The application notes then state that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community." USSG § 1B1.13 cmt. n.4.

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Based on the statutory text, and the Supreme Court's decision *Dillon v. United States*, 560 U.S. 817, 827 (2010), addressing policy statement referenced in the parallel provision found in § 3582(c)(2), the government continues to take the position that the policy statement referenced in § 3582(c)(1)(A) should control this Court's analysis. Nonetheless, this Court has already observed that the policy statement contains a "non-exclusive list of things the Court should consider" and the application notes "opens the door to consider reasons other than the examples listed" in determining whether an extraordinary and compelling reason exists to reduce a defendants sentence. *United States v. McPherson*, 454 F. Supp. 3d 1049, 1052 (W.D. Wash. 2020).

But regardless of whether it is binding, as this Court has already noted, it may continue to choose to apply the factors that are set out in the application notes to USSG § 1B1.13, since those notes reflect the Sentencing Commissions' thoughtful consideration of the issue. On that point, the Seventh Circuit made the following observation after concluding that the policy statement was not binding:

> The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive.

*Gunn*, 980 F.3d at 1180.

Therefore, applying the statutory requirements, to be eligible for a reduction in sentence, a defendant must first meet the exhaustion requirements, and then present an "extraordinary and compelling" reason consistent with the policy statement. If those standards are met, this Court must then consider whether a reduction is appropriate after consideration of the factors in 18 U.S.C. § 3553(a) and any danger that the defendant might continue to present to another person or the community. Applying these standards, although Pimentel-Quiroz has already served a significant portion of his sentence, a sentence reduction is not appropriate in this case.

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.      Mayfield Has Not Met the Standard for a Reduction on Sentence.**

   *1.      The Exhaustion Requirement*

As the proponent of the motion, to qualify for a reduction in sentence, the defendant bears the burden of showing he satisfied the exhaustion requirement. *See United States v. Van Sickle,* 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020) (citing cases). Mayfield apparently sent a request to the warden at FCI Beaumont Medium on December 11, 2020, *See* Def. Ex. B. Since more than 30 days have passed since the letter was sent, this statutory requirement has been satisfied at least as to the reason provided.

   *2.      Mayfield's Case Does Not Merit a Reduction in Sentence.*

After satisfying the exhaustion requirement, to be eligible for a district court's discretionary consideration of a possible reduction in sentence, a defendant bears the burden to show "extraordinary and compelling reasons" that meet the high bar set by Congress and the Sentencing Commission. *See Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838 at *7 (W.D. Wash. Apr. 10, 2020). "[A] compassionate release . . . is an extraordinary and rare event." *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) "In general, chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020). (citation omitted)). More importantly, compassionate release is not a tool to "correct" a judgment. *Id.*

   *a.      Mayfield's Medical Reasons.*

As noted above, Mayfield has developed mild kidney disease. The Centers for Disease Control and Prevention (CDC) has identified kidney disease as a factor that would place an individual at increased risk of severe illness from COVID-19.[1] Because the CDC has recognized this medical condition as a risk factor for serious illness from COVID-19,

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB  - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

Mayfield's kidney disease does provide an extraordinary and compelling reason permitting this Court to consider whether a reduction in sentence is warranted.

That said, the fact that Mayfield has already had COVID-19 cuts against his application. As of October 27, 2020, the CDC stated that while cases of reinfection have been reported they remain rare.[2] More importantly, research increasingly shows that people who have contracted the Coronavirus and recovered gain lasting immunity. *See,* "Immunity to the Coronavirus May Last Years, New Data Hint, *New York Times*, November 17, 2020.[3] At least one study suggests that the such reinfection is highly unlikely for at least six months.[4] Another study suggests that immunity could last much longer. *See,* "Post-Infection Coronavirus Immunity Usually Robust after 8 Months, Study Shows," *Washington Post,* January 7, 2021.[5] While speculation continues regarding reinfection possibility in light of the development of new variants, it is a fact that he has at least developed some immunities as a result.

   b.   *COVID-19 and the Bureau of Prisons.*

The defense motion is also focused on the Bureau of Prisons and cases of COVID-19 in its institutions. There is no doubt that BOP has not been successful at keeping COVID-19 out of its institutions, and that it has been difficult to control spread of this virus once it enters an institution. But to suggest that the BOP has not made efforts to control the spread of this disease within its institutions is false. All BOP institutions are following the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19)

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html

[3] Immunity to the Coronavirus May Last Years, New Data Hint - The New York Times (nytimes.com). *See also*, Covid immunity: Can you catch it twice? - BBC News

[4] *See* https://www.reuters.com/article/us-health-coronavirus-reinfection/covid-19-reinfection-unlikely-for-at-least-six-months-study-finds-idUSKBN28015L (November 20, 2020).

[5] https://www.washingtonpost.com/health/post-infection-coronavirus-immunity-usually-robust-after-8-months-study-shows/2021/01/07/d7d369a6-511a-11eb-b96e-0e54447b23a1_story.html   Of note, the article notes that immunity may well last much longer, but the study was limited by the fact that the virus was new which limits the available data.

Government's Response to Motion for Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB  - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  in Correctional and Detention Facilities.⁶  BOP has also placed some 22,485 inmates on
2  home confinement since March 26, 2020, thereby reducing the overall population of
3  inmates in its institutions.  And FCI Beaumont Medium has brought its prior outbreak of
4  COVID-19 under control  As of this date, there are only 2 inmates with active cases of
5  COVID-19 at this institution where Mayfield is being housed.⁷

6  More importantly, BOP had been actively vaccinating staff and inmates at each of
7  its institutions.  BOP is not relying on individual States for its allotments of vaccine or
8  State strategies and priorities for vaccine distribution.  Rather, it is working with the
9  Federal Government's COVID-19 Vaccine/Therapeutics Operation (formerly known as
10 Operation Warp Speed) and receives vaccines directly which it allocates among its
11 facilities and is not subject to the restrictions that the individual states have placed on
12 eligibility.  As a result, as of February 22, 2021, every BOP facility has received first doses
13 of vaccine and seventy locations have received second doses.⁸  According to the BOP
14 website, as of March 5, 2021, BOP already has received some 67,210 doses of vaccine and
15 administered some 71,241 doses because it uses the sixth dose of vaccine that is typically
16 found in the Pfizer-BioNTech vials.  The CDC Vaccine Tracker reports that, as of March 5,
17 2021, some 25,852 staff and inmates at BOP facilities have already received two doses of
18 vaccine.⁹  And as more vaccine doses are administered, the risk to inmates at all BOP
19 institutions will significantly lessen.

20              *c.*      *Mayfield's Sentence and Rehabilitative Efforts.*
21 The principal focus of Mayfield's motion appears to be on the rehabilitative efforts
22 that Mayfield has made and the length of the sentence he has already served.  While his

---

⁶ *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

⁷ *See* https://www.bop.gov/coronavirus/

⁸ *See* https://www.bop.gov/resources/news/20210223_vaccination_status.jsp

⁹ *See* https://covid.cdc.gov/covid-data-tracker/#vaccinations

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

efforts within the BOP institution are to be commended, one aspect of his presentation remains profoundly disturbing. Mayfield's written request to the warden continues to claim that he was merely present during the murders and did not actually take part in the killings. *See* Def. Ex. B. But that assertion is belied by Mayfield's own statements under oath at his change of plea hearing, and the confession he made to his friend Outland in which he described the acts that he committed. He now claims that he simply stood by while Jackson committed the murders, even though the evidence clearly shows that two individuals with two weapons committed the crimes. He also suggests that he attempted to save one of the children not withstanding his earlier statements.

Mayfield's written statement to the warden also repeats his claim that he was tricked into pleading guilty by his defense lawyers using the threat of the death penalty. He suggests that he wanted to proceed to trial, and asserts that he was not charged with an offense that carried death as a penalty. That is obviously not true since death is one of the two statutory penalties available for a violation of 18 U.S.C. § 1111(a) where murder with premeditation is charged, as it was in this case. It is certainly true that at the time of Mayfield's guilty plea, the government had yet not announced whether it would seek death as a sentence if Mayfield and the other defendants were found guilty following a trial, but as the Ninth Circuit observed, it would have been ineffective assistance for counsel not to have raised that possibility with Mayfield as the matter moved towards trial.

In short, this statement suggest that Mayfield has yet to feel remorse for his crimes. Instead, his statement shows only remorse for his sentence and his decision to enter a guilty plea. This fact, standing alone, suggests that Mayfield he should not receive a reduction in sentence.

As to Mayfield's education efforts, work ethic and behavior in prison, while worthy of note, these facts, standing alone, cannot qualify as an extraordinary and compelling reason to reduce his sentence. In the statute directing the Sentencing Commission to adopt the policy statement mentioned in § 3582(c)(1)(A), Congress has expressly stated "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

compelling reasons." 28 U.S.C. § 994(t). Thus, no matter how commendable, rehabilitation alone may not serve as an extraordinary and compelling reason to permit a court to reduce a sentence.

Similarly, the length of Mayfield's sentence is not an extraordinary and compelling reason for a sentencing reduction. Life is the sentence that Congress mandated for anyone who carries out a premeditated plan to take the life of another human being. In this case Mayfield participated in carrying out not only one murder, but four. Life is not an extraordinary punishment for such violent and senseless crime.

Moreover, even if USSG § 1B1.13, is not binding on this Court, is it significant that in enacting the First Step Act, Congress did not direct any changes to the guidance in the policy statement for what type of factors should be considered extraordinary and compelling. Nothing in the history of the provision suggests that the length of a defendant's sentence, standing alone, should be enough to constitute an extraordinary and compelling reason. And with good reason, that would undermine the finality in sentencing that the statute demands.

### 3. *The § 3553(a) Factors Don't Support Mayfield's Release.*

Even if extraordinary and compelling reasons exist, before this Court may reduce Mayfield's sentence, this Court must still consider whether a reduction is warranted after applying the factors in 18 U.S.C. § 3553(a). Further, this Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13; *see also United States v. Gotti*, No. 02-cr-743-CM, 2020 WL 497987 (SDNY 2020) (finding that even if medically eligible, release was inappropriate because defendant poses a continuing danger to the public).

In this case, the nature and seriousness of this offense is the most significant factor in this analysis. Mayfield participated in a crime that not only took four lives but robbed a mother and a grandfather of the joy and ability to watch three children grow to adulthood and have children of their own. Mayfield was involved in the brutal, violent taking of three

Government's Response to Motion for
Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

precious, blameless lives, whose only mistake was to be present in their home with their father when Mayfield and Jackson came to seek vengeance for what they believed to be his "snitching." Twenty-eight years, although a long time is simply not enough to atone for that loss.

Moreover, while Mayfield's institution history is worthy of credit and should be included in the balancing of the § 3553(a) factors, it does not outweigh the other factors. Indeed, his unwillingness after all this time to express remorse for his conduct and instead to cling to a narrative that he simply stood by suggests that the time has not yet come to end his term of imprisonment. COVID-19 and his kidney disease since do not outweigh that fact.

## CONCLUSION

For all of the above reasons, defendant's motion for compassionate release should be denied.

Dated this 5th day of March, 2021.

Respectfully submitted,

TESSA M. GORMAN
ACTING UNITED STATES ATTORNEY

*s/ Helen J. Brunner*
HELEN J. BRUNNER
Assistant United States Attorney
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Tel: (206) 553-5172
Email: Micki.Brunner@usdoj.gov

Government's Response to Motion for Compassionate Release/
*United States v. Mayfield,* 92-CR-1781-RJB - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970